**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

NATHAN HAMILTON CHURCH,

                              Plaintiff,

vs.

EQUIFAX INFORMATION SERVICES,
LLC; EXPERIAN INFORMATION
SOLUTIONS, INC; and TRANS UNION,
LLC,

                              Defendants.

Civil Action No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Nathan Hamilton Church ("Plaintiff" or "Mr. Church"), a living, breathing, 40-year-old consumer, brings this Complaint against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); and Trans Union, LLC ("Trans Union") (collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making

1

by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendants acknowledge this potential for misuse and resulting damage every time they sell their credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. Defendants Equifax, Experian, and Trans Union are each CRAs as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f).

5. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

8.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

9.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

10.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

11.     This action seeks actual, statutory, and punitive damages, costs and attorneys' fees for Plaintiff against Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

12.     Plaintiff Nathan Hamilton Church ("Plaintiff" or "Mr. Church") is a natural person who resides in the Town of Boone, County of Watauga, State of North Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13.     Defendant Equifax Information Services, LLC. ("Equifax") is a foreign limited liability company authorized to do business in the State of North Carolina and in the Western District.

14.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

15.     Defendant Experian Information Solutions, Inc. ("Experian") is a foreign limited liability company authorized to do business in the State of North Carolina and the Western District.

16.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.     Defendant Trans Union, LLC ("Trans Union") is a foreign limited liability company authorized to do business in the State of North Carolina and in the Western District.

18.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

**The Credit Bureau Defendants' Practices Concerning the Sale of Credit Reports on the "Deceased"**

21.     Defendants Equifax, Experian, and Trans Union sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

22.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants Equifax, Experian, and Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

23.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants Equifax, Experian, and Trans Union, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

5

24. Defendants Equifax, Experian, and Trans Union routinely place a "deceased" notation or marking on credit reports when they are advised by any of their many data furnishing sources (such as banks and debt collectors) that a given consumer is deceased.

25. Defendants Equifax, Experian, and Trans Union's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

26. Defendants Equifax, Experian, and Trans Union do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

27. Defendants Equifax, Experian, and Trans Union do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

28. Defendants Equifax, Experian, and Trans Union do not independently verify with any source or furnisher that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

29. In some cases, in order to assure accuracy, Defendants Equifax, Experian, and Trans Union may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendants Equifax, Experian, and Trans Union do not have any procedure to notify consumers (such as a

6

next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

30.      Defendants Equifax, Experian, and Trans Union regularly receive the "Death Master File" from the Social Security Administration, including weekly and/or monthly updates, listing by social security number those consumers that the government believes to be deceased. But Defendants Equifax, Experian, and Trans Union do not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

31.      Defendants Equifax, Experian, and Trans Union will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

32.      Defendants Equifax, Experian, and Trans Union do not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

33.      Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants Equifax, Experian, and Trans Union do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

34.      Even in instances where the purportedly deceased consumer communicates directly with Defendants Equifax, Experian, and Trans Union, Defendants Equifax, Experian, and Trans Union do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

7

35. Once a "deceased" mark is placed upon a consumer's report, Defendants Equifax, Experian, and Trans Union will not calculate and will not provide a credit score for that consumer.

36. Upon Defendants Equifax, Experian, and Trans Union's reports with a "deceased" mark sold to third parties, Defendants Equifax, Experian, and Trans Union never calculate or provide a credit score for that consumer and instead reports that consumer's credit score as "N/A."

37. Defendants Equifax, Experian, and Trans Union know that third party credit issuers require a credit score in order to process a given credit application.

38. Defendants Equifax, Experian, and Trans Union know that consumers without credit scores are unable to secure any credit from most credit issuers.

39. Defendants Equifax, Experian, and Trans Union know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

40. Defendants Equifax, Experian, and Trans Union have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

41. Defendants Equifax, Experian, and Trans Union have received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

42. Defendants Equifax, Experian, and Trans Union know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, even when said consumers (and their dates of birth and social security numbers) are not on the Death Master File and are, in fact, alive.

8

43.     Nevertheless, Defendants Equifax, Experian, and Trans Union do not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is, in fact, deceased.

44.     Even consumers who dispute the erroneous "deceased" status on their Equifax, Experian, and Trans Union credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

45.     Defendants Equifax, Experian, and Trans Union do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

46.     Nor do Defendants Equifax, Experian, and Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

47.     For years after a consumer's actual death, Defendants Equifax, Experian, and Trans Union will continue to sell credit reports about that consumer.

48.     Defendants Equifax, Experian, and Trans Union will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

49.     Defendants Equifax, Experian, and Trans Union charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

50.     Defendants Equifax, Experian, and Trans Union profit from the sale of reports on deceased consumers.

51.     Defendants Equifax, Experian, and Trans Union have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

52.     Defendants Equifax, Experian, and Trans Union know that truly deceased consumers do not apply for credit.

53.     Defendants Equifax, Experian, and Trans Union know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendants Equifax, Experian, and Trans Union to be a common and major source of identity theft.

54.     Defendants Equifax, Experian, and Trans Union know that identity theft and credit fraud are serious and widespread problems in our society.

55.     Defendants Equifax, Experian, and Trans Union warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

56.     Defendants Equifax, Experian, and Trans Union have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

57.     Defendants Equifax, Experian, and Trans Union sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

58.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants Equifax, Experian, and Trans Union to sell their credit reports, absent a court order.

59.     Defendants Equifax, Experian, and Trans Union know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### JPMorgan Chase Bank Denies Plaintiff Credit in May 2020 Due to Defendant Equifax's Inaccurate Credit Reporting

60.     On or about May 15, 2020, Plaintiff sought to obtain a retail credit card for purchases at Belk Department Store and submitted a credit application.

61.     Shortly thereafter, in or about May 2020, JPMorgan Chase Bank denied Plaintiff's credit application based upon the contents of Plaintiff's Equifax credit report.

62.     Plaintiff takes great pride in his good name and established credit rating and works hard to ensure that his bills are paid in-full and on-time each month. He believes and understands that his credit record with his creditors is good, so Plaintiff could not imagine how his credit application had been denied by JPMorgan Chase Bank.

### Credit One, LLC Denies Plaintiff Credit in June 2020 Due to Defendant Experian's Inaccurate Credit Reporting

63.     On or about June 12, 2020, Plaintiff sought to obtain a Credit One credit card and submitted a credit application.

11

64.    Shortly thereafter, in or about June 2020, Credit One denied Plaintiff's credit application based upon the contents of Plaintiff's Experian credit report.

65.    Plaintiff was informed that his credit application was denied by Credit One because his Experian credit report indicated that he is deceased.

66.    While angry and confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing or obtain credit in the future, Plaintiff genuinely believed that such an obvious error would have to be fairly easily corrected. However, Plaintiff quickly discovered that correcting this obvious error would not be as easy as he had first hoped, as Credit One informed him that it could not approve him for a credit card given the information reported by Experian.

**Plaintiff's First Round of Disputes with the Credit Bureaus in July 2020**

67.    On or about July 24, 2020, extremely shocked, surprised, and embarrassed at Defendants' inaccurate reporting, Plaintiff mailed written disputes to Equifax, Experian, and Trans Union, via certified mail, disputing the deceased notations that all three credit bureaus were reporting in his credit reports. Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and send him corrected copies of his credit reports.

68.    Plaintiff's July 2020 disputes specifically included his full name, date of birth, Social Security number, and current address so that the credit bureaus would be able to properly identify him and locate his credit files.

**The Credit Bureaus' Method for Considering Consumer Credit Report Disputes**

69.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

12

70.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

71.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

72.     Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

73.     Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

74.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

75.     These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

76.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

77. The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

78. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**The Credit Bureaus' Responses to Plaintiff's July 2020 Disputes**

79. Defendants Equifax, Experian, and Trans Union did not respond to Plaintiff's July 24, 2020 disputes.

80. Defendants Equifax, Experian, and Trans Union did not indicate that Plaintiff's July 24, 2020 disputes were found to be frivolous or irrelevant.

81. Defendants Equifax, Experian, and Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's July 24, 2020 disputes, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

82. Thereafter, Defendants Equifax, Experian, and Trans Union failed to correct or delete the deceased notation appearing in Plaintiff's credit reports and continued to report him as deceased thereafter.

**Plaintiff Receives His Trans Union Credit Report in October 2020 and Discovers that Defendant Trans Union is Still Reporting Him as Deceased**

83.     On or about October 2, 2020, Plaintiff obtained a copy of his Trans Union credit report.

84.     Upon review, Plaintiff discovered that like Equifax and Experian, Trans Union was reporting him as "deceased" and that the deceased notation was reflected in the following tradelines on his Trans Union credit report:

1. American Express
   Account Number 349992476387****
   Responsibility: Consumer Deceased
   Date Opened: 07/20/2017

2. Capital One Bank USA NA
   Account Number 517805798902****
   Responsibility: Consumer Deceased
   Date Opened: 03/22/2016

3. Capital One Bank USA NA
   Account Number 517805801760****
   Responsibility: Consumer Deceased
   Date Opened: 05/10/2016

4. Capital One, N.A.
   Account Number 520602081713****
   Responsibility: Consumer Deceased
   Date Opened: 05/07/2017

5. ComenityBank/Hot Topic
   Account Number 585637955208****
   Responsibility: Consumer Deceased
   Date Opened: 07/20/2017

6. SYNCB/PayPal Credit Card
   Account Number 521853160361****
   Responsibility: Consumer Deceased
   Date Opened: 10/01/2017

15

7. SYNCB/Wal-Mart
   Account Number 609765377232****
   Responsibility: Consumer Deceased
   Date Opened: 10/06/2017

8. SYNCB/Wal-Mart
   Account Number 609765375097****
   Responsibility: Consumer Deceased
   Date Opened: 07/24/2016

85. As of October 2, 2020, all eight (8) of the above-referenced tradelines/accounts were reporting inaccurately in Plaintiff's Trans Union credit report because Plaintiff is not deceased.

**Plaintiff's Second Round of Disputes with the Credit Bureaus in October 2020**

86. On or about October 14, 2020, feeling even more shocked, surprised, and embarrassed as a result of Defendants' inaccurate reporting, Plaintiff mailed written disputes to Equifax, Experian, and Trans Union, via certified mail, disputing the deceased notations that all three credit bureaus were reporting in his credit reports. Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and send him corrected copies of his credit reports.

87. Plaintiff's October 2020 disputes specifically included his full name, date of birth, Social Security number, and current address so that the credit bureaus would be able to properly identify him and locate his credit files.

88. Plaintiff also attached the following documents to his October 2020 disputes to serve as further proof that he is alive: a photocopy of his current driver's license and Social Security card.

16

**The Credit Bureaus' Responses to Plaintiff's October 2020 Disputes**

89.     Upon receiving Plaintiff's written dispute in October 2020, Equifax sent ACDVs

to the following furnishers regarding the following credit accounts Plaintiff disputed:

1.  American Express
    Account Number 349992476387****
    Responsibility: Consumer Deceased
    Date Opened: 07/20/2017

2.  Capital One Bank USA NA
    Account Number 517805798902****
    Responsibility: Consumer Deceased
    Date Opened: 03/22/2016

3.  Capital One, N.A.
    Account Number 520602081713****
    Responsibility: Consumer Deceased
    Date Opened: 05/07/2017

4.  ComenityBank/Hot Topic
    Account Number 585637955208****
    Responsibility: Consumer Deceased
    Date Opened: 07/20/2017

5.  SYNCB/PayPal Credit Card
    Account Number 521853160361****
    Responsibility: Consumer Deceased
    Date Opened: 10/01/2017

6.  SYNCB/Wal-Mart
    Account Number 609765377232****
    Responsibility: Consumer Deceased
    Date Opened: 10/06/2017

7.  SYNCB/Wal-Mart
    Account Number 609765375097****
    Responsibility: Consumer Deceased
    Date Opened: 07/24/2016

17

90. American Express verified for Equifax that Account #349992476387**** belongs to Plaintiff, that Plaintiff is in fact deceased, and that the account is accurately reporting on his Equifax credit report.

91. Capital One instructed Equifax to change the "Whose Account" designation on Account #517805798902**** from "Consumer Deceased" to "Undesignated."

92. Synchrony Bank verified for Equifax that Account #521853160361**** belongs to Plaintiff, that Plaintiff is in fact deceased, and that the account is accurately reporting on his Equifax credit report.

93. Comenity Bank instructed Equifax to change the "Whose Account" designation on Account #585637955208**** from "Consumer Deceased" to "Individual Account."

94. Equifax confirmed that Synchrony Bank Account #s 609765377232**** and 609765375097**** are not currently reporting in Plaintiff's Equifax credit file.

95. On November 18, 2020, Equifax completed its reinvestigation of Plaintiff's dispute and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation to Plaintiff. Equifax failed to properly reinvestigate and delete the deceased notation on at least two (2) of the seven (7) disputed credit accounts, which continued to appear on Plaintiff's Equifax credit report.

**Plaintiff's Third Round of Disputes with Defendants Equifax and Trans Union in November 2020**

96. On or about November 25, 2020, Plaintiff yet again mailed written disputes to Equifax and Trans Union, via certified mail, disputing the deceased notations that the credit bureaus were reporting in his credit reports. Plaintiff requested that Equifax and Trans Union reinvestigate the disputed information, correct the reporting, and send him corrected copies of his credit reports.

18

97. Plaintiff's November 2020 disputes specifically included his full name, date of birth, Social Security number, and current address so that the credit bureaus would be able to properly identify him and locate his credit files.

98. Plaintiff also attached the following documents to his November 2020 disputes to serve as further proof that he is alive: a photocopy of his current driver's license and Social Security card.

**Citibank Denies Plaintiff Credit in December 2020 Due to Defendant Experian's Inaccurate Credit Reporting**

99. On or about December 5, 2020, Plaintiff sought to obtain a Citibank credit card and submitted a credit application.

100. Shortly thereafter, in or about December 2020, Citibank denied Plaintiff's credit application based upon the contents of Plaintiff's Experian credit report.

101. As of December 5, 2020, Experian was still reporting seven (7) tradelines on Plaintiff's credit report indicating that he was deceased.

**Discover Financial Services Denies Plaintiff Credit in December 2020 Due to Defendant Experian's Inaccurate Credit Reporting**

102. On or about December 5, 2020, Plaintiff sought to obtain a Discover credit card and submitted a credit application.

103. Shortly thereafter, in or about December 2020, Discover Financial Services denied Plaintiff's credit application based upon the contents of Plaintiff's Experian credit report.

104. As of December 5, 2020, Experian was still reporting seven (7) tradelines on Plaintiff's credit report indicating that he was deceased.

19

**Plaintiff Receives His Equifax, Experian, and Trans Union Credit Reports in December 2020 and Discovers that Defendants are Still Reporting Him as Deceased**

105. In or about the first two weeks of December 2020, extremely stressed and frustrated with his inability to obtain credit and anxious about what it meant for his financial future, Plaintiff obtained copies of his Equifax, Experian, and Trans Union credit reports.

106. Upon review, Plaintiff discovered that despite his multiple disputes, Equifax, Experian, and Trans Union were still reporting him as "deceased" on multiple tradelines in his credit reports.

107. As of December 5, 2020, the deceased notation was reflected in the following tradelines on Plaintiff's Trans Union credit report:

1. American Express
   Account Number 349992476387****
   Responsibility: Consumer Deceased
   Date Opened: 07/20/2017

2. Capital One Bank USA NA
   Account Number 517805801760****
   Responsibility: Consumer Deceased
   Date Opened: 05/10/2016

3. ComenityBank/Hot Topic
   Account Number 585637955208****
   Responsibility: Consumer Deceased
   Date Opened: 07/20/2017

4. SYNCB/PayPal Credit Card
   Account Number 521853160361****
   Responsibility: Consumer Deceased
   Date Opened: 10/01/2017

5. SYNCB/Wal-Mart
   Account Number 609765377232****
   Responsibility: Consumer Deceased
   Date Opened: 10/06/2017

6. SYNCB/Wal-Mart
Account Number 609765375097****
Responsibility: Consumer Deceased
Date Opened: 07/24/2016

108.　As of December 5, 2020, all six (6) of the above-referenced tradelines/accounts were reporting inaccurately in Plaintiff's Trans Union credit report because Plaintiff is not deceased.

109.　As of December 5, 2020, the deceased notation was reflected in the following tradelines on Plaintiff's Experian credit report:

1. ADS/COMENITY/HOTTOPIC
Account Number 585637XXXXXXXXXX
Responsibility: Deceased
Date Opened: 07/20/2017

2. American Express
Account Number 349992XXXXXXXXXX
Responsibility: Deceased
Date Opened: 07/20/2017

3. Capital One
Account Number 517805XXXXXXXXXX
Responsibility: Deceased
Date Opened: 05/10/2016

4. Capital One
Account Number 520602XXXXXXXXXX
Responsibility: Deceased
Date Opened: 05/07/2017

5. SYNCB/PPMC
Account Number 521853XXXXXXXXXX
Responsibility: Deceased
Date Opened: 10/01/2017

6. SYNCB/WALMART
Account Number 603220XXXXXXXXXX
Responsibility: Deceased

Date Opened: 07/24/2016

    7.  SYNCB/WALMART
Account Number 603220XXXXXXXXXX
Responsibility: Deceased
Date Opened: 10/06/2017

110.    As of December 5, 2020, all seven (7) of the above-referenced tradelines/accounts were reporting inaccurately in Plaintiff's Experian credit report because Plaintiff is not deceased.

111.    As of December 5, 2020, the deceased notation was reflected in the following tradelines on Plaintiff's Equifax credit report:

    1.  American Express
Account Number 349992476387****
Account Status: Consumer Deceased
Date Opened: 07/20/2017

    2.  Capital One Bank USA NA
Account Number 517805801760****
Account Status: Consumer Deceased
Date Opened: 05/10/2016

    3.  ComenityBank/Hot Topic
Account Number 585637955208****
Account Status: Consumer Deceased
Date Opened: 07/20/2017

    4.  SYNCB/PayPal Credit Card
Account Number 521853160361****
Account Status: Consumer Deceased
Date Opened: 10/01/2017

112.    As of December 5, 2020, all four (4) of the above-referenced tradelines/accounts were reporting inaccurately in Plaintiff's Equifax credit report because Plaintiff is not deceased.

22

**Plaintiff's Fourth Disputes with Defendants Equifax and Experian in January 2021**

113.    In or about late January 2021, Plaintiff, feeling hopeless and unable to use his credit in any way, yet again mailed written disputes to Equifax and Experian, via certified mail, disputing the deceased notations that the credit bureaus were reporting in his credit reports. Plaintiff requested that Equifax and Experian reinvestigate the disputed information, correct the reporting, and send him corrected copies of his credit reports.

114.    Plaintiff's January 2021 disputes specifically included his full name, date of birth, Social Security number, and current address so that the credit bureaus would be able to properly identify him and locate his credit files.

115.    Plaintiff also attached the following documents to his January 2021 disputes to serve as further proof that he is alive: a photocopy of his current driver's license and Social Security card.

116.    To date, neither Equifax nor Experian has responded to Plaintiff's January 2021 disputes and both credit bureaus continue to report Plaintiff as deceased.

117.    As a result of the multiple "deceased" annotations contained throughout Plaintiff's credit reports, Defendants Equifax, Experian, and Trans Union made it practically impossible for Plaintiff to obtain credit.

118.    As a standard practice, Defendants Equifax, Experian, and Trans Union do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the

consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230–31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

119.    Consistent with their standard policies and procedures, Defendants Equifax, Experian, and Trans Union automatically generated their "investigation" results once the aforementioned furnishers provided their responses to Plaintiff's disputes, verifying that Plaintiff was deceased, and no employee from any of the credit bureaus took any additional steps to review Plaintiff's documentation, information, or the Social Security Administration's ("SSA") Death Master File, which Defendants purchase from the SSA, after the furnishers provided their responses to Plaintiff's disputes.

120.    Instead, Defendants Equifax, Experian, and Trans Union blindly accepted the aforementioned furnishers' incomplete version of the facts and continued to report the inaccurate, derogatory information on Plaintiff's credit reports, namely, that he is deceased.

121.    Defendants Equifax, Experian, and Trans Union continue the practice of parroting the response from furnishers even though they have been repeatedly sued for failing to conduct reasonable investigations as required by the FCRA.

122.    Defendants Equifax, Experian, and Trans Union do not intend to modify their dispute-processing procedures because doing so would drastically increase their operating expenses.

123. Instead, Defendants Equifax, Experian, and Trans Union intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants Equifax, Experian, and Trans Union's violations of the FCRA are willful.

124. At all times pertinent hereto, Defendants Equifax, Experian, and Trans Union were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

125. At all times pertinent hereto, the conduct of Defendants Equifax, Experian, and Trans Union, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

126. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-125 as if fully stated herein.

127. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

128. On multiple occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

129. Despite actual and implied knowledge that Plaintiff is not dead, Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

130. Defendants Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

131. As a result of Defendant Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

132. Defendant Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

133. Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

134. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-125 as if fully stated herein.

135. The FCRA mandates that Defendants Equifax, Experian, and Trans Union conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of

information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act impose a 30-day time limitation for the completion of such an investigation. *Id.*

136.    The FCRA provides that if Defendants Equifax, Experian, and Trans Union conduct an investigation of disputed information and confirm that the information is in fact inaccurate, or are unable to verify the accuracy of the disputed information, they are required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

137.    On multiple occasions during 2020 and 2021, Plaintiff sent written disputes to Defendants Equifax, Experian, and Trans Union, pleading with them to comply with their statutory reinvestigation obligations and correct and/or delete specific items in his credit files that are patently inaccurate, misleading, and highly damaging to him and his ability to obtain credit, namely, references to him being "deceased."

138.    Either Defendants Equifax, Experian, and Trans Union conducted *no* investigation of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit files, namely, the deceased notations.

139.    Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i on multiple occasions by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files.

140.    As a result of Defendant Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from

his credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

141. Defendant Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

142. Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)     Determining that Defendants negligently and/or willfully violated the FCRA;

b)     Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)     Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

143. Plaintiff demands a trial by jury.

28

Dated: February 22, 2021

/s/ *Asa C. Edwards*
Asa C. Edwards, NC Bar No. 46000
MAGINNIS HOWARD
4801 Glenwood Ave., Suite 310
Raleigh, NC 27612
Telephone: (919) 526-0450
Fax: (919) 882-8763
Email: aedwards@maginnishoward.com

Hans W. Lodge
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 607-7794
Fax: (612) 584-4470
Email: hlodge@bm.net
*(PRO HAC VICE FORTHCOMING)*

Joseph P. McClelland
545 N. McDonough Street, Suite 210
Decatur, GA 30030
Telephone: (770) 775-0938
Fax: (470) 468-0070
Email: joseph@jacksonlaws.com
*(PRO HAC VICE FORTHCOMING)*

*ATTORNEYS FOR PLAINTIFF*